1
2
3
4
5
6
7
8        IN THE UNITED STATES DISTRICT COURT

9        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ROBERT M. FENENBOCK,

11        Petitioner,                    No. CIV S-97-1731 LKK CHS P

12        vs.

13   DIRECTOR OF DEPARTMENT OF
     CORRECTIONS,
14
          Respondent.          FINDINGS AND RECOMMENDATIONS
15
     _____/
16

17   I.      INTRODUCTION

18          Petitioner Robert Fenenbock is a state prisoner proceeding with counsel

19   on a second amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

20   Fenenbock attacks his March 16, 1994 conviction in the Solano County Superior Court,

21   case number C35712, for first-degree murder.

22   II.     ISSUES

23          Petitioner's May 14, 2009, second amended petition raises seven issues

24   as follow, verbatim:

25          A.      Mr. Fenenbock is innocent of the murder of Gary "Hop" Summar;

26   /////

                                      1

B.   Denial of rights to present a defense and to compulsory process due to the order of the trials;

C.   Trial court errors regarding the presentation and impeachment of the testimony of Randy Hogrefe violated petitioner's constitutional rights;

D.   Insufficiency of the evidence to establish premeditation and deliberation;

E.   Failure to instruct lesser included offenses of second degree murder and/or manslaughter, or on provocation;

F.   The trial court violated Mr. Fenenbock's right to due process by allowing the prosecutor to sandbag the defense; and

G.   The cumulative effect of the errors raised herein warrant reversal of petitioner's conviction.

/////

Upon careful consideration of the record and the applicable law, the undersigned will recommend this petition be denied.

III.   FACTUAL AND PROCEDURAL HISTORY

A.   Facts[1]

The events occurred in Hawkins Bar, a small hamlet located on Highway 299 in Trinity County.  Hawkins Bar consists of a general store, a set of BP gasoline pumps adjoining the store, and a bar (Simon Legree's) located across the highway from the store.  Next to the store was a trailer park.

---

[1] This statement of facts is taken from the July 1, 1996 opinion by the California Court of Appeal for the First Appellate District (hereinafter Opinion), lodged with respondent's answer as Exhibit L, Part 1.  The murder of Hop Summar resulted in the prosecution of multiple defendants, in separate trials, some of which involved multiple juries.  Fenenbock was tried along with Sue Hamby and Cherri Frazier in front of a single jury.  This statement of facts from the California Court of Appeal is drawn from only the facts presented at Fenenbock's trial and presented to the jury that determined Fenenbock's guilt, unlike the statement of facts from the California Court of Appeal opinion concerning Bond and MacCarlie, where that court consolidated the appeals of Bond, MacCarlie, Adcock and Lockley, resulting in a single statement of facts that not only referenced the testimony heard by the Bond jury and the MacCarlie/Dodds jury, but also the testimony heard by the Adcock/Lockley jury.  That is why the California Court of Appeal statement of facts may be relied upon here, but not in the Bond (99-cv-2150) and MacCarlie (00-cv-1830) Findings and Recommendations.  These facts have not been rebutted with clear and convincing evidence and therefore are presumed correct. 28 U.S.C. § 2254(e)(1); Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004).

2

It was here that Barbara Adcock lived with Bernard "Bird" MacCarlie and her three children from a prior marriage.

Below the highway, along the river, was a United States Forest Service campground accessible by a service road. In September and October 1991 a group of people were camped in the campground. They were described by local residents as drunk and violent, especially wild and out of control. Some of the campers had been there several weeks; some were drifters. One couple had come to get married at the Harvest Moon Festival on October 5. Defendant Cherri Frazier was there to attend the wedding. Some of the local residents-including Adcock, MacCarlie and defendants Fenenbock and Hamby-spent time at the campground.

*The Prosecution's Case*

It was the prosecution's theory that Hop Summar was killed by a mob from Hawkins Bar seeking to avenge an alleged act of child molestation upon Barbara Adcock's daughter.

*The Victim*

Hop Summar was a pathetic figure. Crippled from numerous childhood orthopedic surgeries, he walked with a limp (hence the nickname, "Hop"). Though he was in his 30's, he was physically frail, wore a colostomy bag, and had a rather meek disposition. He lived on SSI (Supplemental Security Income) and drank to excess nearly every day. He seldom bathed and was distinctive for his offensive body odor.

Hop had known Bird MacCarlie for several years, and he often lived with Bird in the trailer Bird shared with Barbara Adcock and her children. Sometimes Hop looked after Adcock's children while Adcock was partying at the campground.

*The Molestation Accusations*

On September 30, 1991, Barbara Adcock reported to the Trinity County Sheriff's Department that Hop Summar had molested her five-year-old daughter Rachelle H. (Ultimately neither the sheriff nor the county's Child Protective Services found any evidence that Rachelle had been molested.) Adcock and Bird MacCarlie then proceeded to spread the accusations among the denizens of Hawkins Bar.

*Solicitation of Mike Sutton*

Defendant Cherri Frazier arrived at the Hawkins Bar campground on September 30. She was there to attend the

wedding of Leafe and Michelle Dodds.  Frazier had camped at Hawkins Bar earlier that summer.

Almost immediately upon her arrival, Frazier encountered Barbara Adcock, who told her of the molestation of Rachelle. That same day, or the following day, Frazier gave a ride to Mike Sutton, a drifter also camping at Hawkins Bar.  During the ride Sutton noticed a blue-handled knife on the dashboard.  Frazier said, "I'm going to go and cut off Hop's balls."  Frazier asked Sutton to come with her, but he refused.  She then told him to "stay out of it."

In that same ride, Frazier told Bert Jones (another transient camped at Hawkins Bar) that she needed to do something about Hop's molestation of Barbara Adcock's daughter; that she would drag Hop into the woods herself and kill him if she had to.

On the evening of October l, Mike Sutton was in the campground and heard Bird MacCarlie, Barbara Adcock and "Redbeard" Bob Bond discussing how to kill Hop.  Barbara Adcock was sitting at a picnic table with defendants Cherri Frazier and Sue Hamby. Barbara and Cherri asked Sutton if he wanted to be in on it, as they weren't getting any help from the others.  He declined.  As he walked away from the group of women, Sutton heard the women discussing that defendant Sue Hamby was to keep Hop at her house so that Barbara Adcock could find him once she rounded up help to hurt him.  Later that night, Sue Hamby apologized to Mike Sutton for being so forward in the conversation.

*The Assaults Upon Hop*

On October 1, Hop went into Arcata and withdrew $600 in cash from his bank account.  About 5:30 in the evening, he returned to Hawkins Bar, having hitched a ride.  The driver dropped him at the BP pumps.  As Hop tried to enter the trailer where he resided with MacCarlie and Adcock, a group approached him and began to call him a rapist and a child molester.  Included in the group were MacCarlie, Adcock, defendant Fenenbock, defendant Frazier and others.[2]  As the crowd egged her on, a woman named April May Gault chased Hop, caught up with him when he stumbled, and beat him.

The attendant at the BP pumps did not see the beating, but

---

[2] A police officer's report attributed the reporting of these facts to Maeolla Berry. FRT at 4632.  Berry however testified that she did not remember the incident or implicating Fenenbock as being present.  Id. at 4473-74, 4477.

he saw Hop just afterward.  His face was cut and bleeding.
Hop told him April May had hit him with a beer can.

Sometime later, Hop was assaulted again.  About 6:00 he
went into Simon Legree's, the town bar.  The bartender and
patrons observed that Hop's face was cut and bleeding.
Hop told the bartender that Harry Darr had struck him in the
face with a pistol because he had refused to get into Darr's
truck.

Indeed, just beforehand, Harry Darr had come into Maeolla
Berry's trailer in the trailer park.  When he left, he jumped
into his truck and rode across the highway.  Maeolla Berry
could see a gun in the truck.  Hop Summar was standing
across the street.  Maeolla Berry did not see Darr get out of
his truck, but she heard Hop yelling for help, and she saw
Darr drive off as patrons of the bar came out to help.

*Defendant Hamby's Role*

Defendant Sue Hamby lived in a trailer east of Hawkins Bar.
Her friend, Michael "Scarecrow" Roanhouse, lived in a
second trailer on Hamby's property.  She gave him food in
exchange for repairwork on the property.  Hamby was
engaged to marry Tex Lockley.

On the morning of October 1, Barbara Adcock and her
children appeared at Hamby's trailer.  Adcock told Hamby
her accusations against Hop Summar.  After Adcock left,
Hamby told Scarecrow Roanhouse, but Scarecrow said he
didn't believe Adcock's story.

That afternoon, Hamby went to Maeolla Berry's trailer and
asked for her advice. Hamby told Maeolla Berry that she was
supposed to keep Hop in her trailer and let Barbara Adcock
know so that Adcock could call the police.  Berry advised
Hamby to call the police herself.

After their conversation, Berry drove Hamby to the
campground so Hamby could retrieve her truck.  On the way
Hamby telephoned Hop to tell him to stay where he was, at
Simon Legree's, and she would pick him up.  Later that
evening, Hamby and Scarecrow Roanhouse came into
Simon Legree's.  Hop was dozing on his bar stool, with his
purple backpack at his side.  When he awoke, Hamby got
him into her truck and drove him to her trailer.  He slept on
her couch.  The next morning, Hamby left her trailer and
went to the campground.  According to her testimony,
Hamby told Scarecrow to keep an eye on Hop in case the
police arrived.

5

*The Confrontation with Hop*

Hop did not stay in Hamby's trailer.  About 6:15 or 6:30 p.m.
Tex Lockley and Scarecrow Roanhouse were driving in
Lockley's red flatbed truck from the general store down to
the campground when they saw Hop on the access road.
They stopped and gave him a ride in the back.  Hop was
carrying his purple backpack.[FN]

> FN. Tex Lockley's truckbed was bloodied from
> the carcass of a wounded pit bull dog.

As the truck approached the campground, however, a group
angrily came toward the truck, shouting, "Get him out of
here."  Barbara Adcock shook a baseball bat, yelling, "Get
the fuck on out of here."  Tex Lockley shifted quickly into
reverse and backed the truck up the hill to the highway.

Scarecrow Roanhouse testified that as the truck reached the
top of the hill and the passengers got out, defendant
Fenenbock and Redbeard Bob Bond walked toward the
truck.  The two men walked up to Hop and struck him in the
face.  Redbeard Bob hit him in the mouth; defendant
Fenenbock hit Hop in the eye.  They accused Hop of being a
child molester, and Hop replied, "Not guilty.  Not guilty."

At this point Steven Thayer was walking up the access road
and passed the red truck.  As he did so, he saw Bird
MacCarlie and Leafe Dodds drive up in Barbara Adcock's
white Ranchero.[FN2] They, too, talked to Hop, and Hop
replied that he hadn't done anything.  Hop asked, "What are
you going to do?  Kill me here?  Throw me in the bushes or
something?"  Bird MacCarlie replied, "Yeah, something like
that."  Steven Thayer testified that when last he saw Hop,
Hop was seated inside the Ranchero between Redbeard
Bob Bond and Bird MacCarlie.  The Ranchero pulled out
onto the highway and headed east.  The red truck followed.

> FN. Meanwhile, Mike Sutton was in the
> campground and saw Bird MacCarlie leave in
> the white Ranchero with Randy H. part way
> under some blankets in the back.  Defendant
> Fenenbock was not in the campground.  He
> showed up later that evening, along with Bird
> MacCarlie, Redbeard Bob Bond, and Tex
> Lockley.

*The Murder*

Barbara Adcock's son, Randy H., Jr., then age 9, was
sleeping on a mattress in the back of the white Ranchero.

6

He testified that after stopping at the top of the hill the Ranchero drove to a place where the men started stabbing Hop.  The men included Bird MacCarlie, defendant Fenenbock, Redbeard Bob Bond and Leafe Dodds.  Afterwards the men dragged Hop to another spot.

Four days later, on October 6, Hop Summar's body was discovered at a logging site.  The body was covered with branches and dirt.  A piece of rope was found nearby and there were ligature marks on Hop's arms, suggesting he had been tied and dragged.  Two logs found nearby were bloodied with Hop's blood.  A bloody knife was found 50 to 75 feet away.  The blood was Hop Summar's.  The knife was the same one used by Bird MacCarlie earlier on October 2 to stab Bert Jones.  Faint tire marks consistent with Tex Lockley's red truck (but not the Ranchero) were found in the roadway at the end of the drag marks.

Hop Summar died of multiple stab wounds and bludgeoning.  His genitals showed signs of severe trauma from a blunt instrument.  Numerous bones in his face were fractured.  His left ear had been cut off while he was still alive.  He had been stabbed 18 times in the skull, 13 times in the chest.  His left eye had been cut out.  His arm and leg had been stabbed, bringing the total stab wounds to over 70.

*The Stabbing of Bert Jones*

Earlier on the day of the murder, on October 2, Bert Jones, a drifter staying in the campground, got into an altercation with Michelle Dodds.  Defendant Cherri Frazier intervened by pushing Jones and demanding that he leave.  Barbara Adcock came at Jones with a baseball bat.  Jones retreated to his camp about a quarter of a mile from the main campground to pack up and leave.

That evening, Bird MacCarlie and Tattoo Ernie Knapp having heard about Jones's run-in with Michelle Dodds, drove in the Ranchero to Jones's campsite.  Bird MacCarlie jumped out of the car and immediately began stabbing Jones.  Bird MacCarlie forced Jones and his camp-mate, Steven Thayer, into the Ranchero, and they drove back to the main campground.  When Jones got out of the car, Bird MacCarlie put a knife to his ear and threatened to cut it off.  Harry Darr eventually intervened and told Jones to leave.  Throughout the assault upon Jones, Barbara Adcock castigated Jones for defending Hop.[FN]

> FN. A couple of days earlier, when accusations were circulating about Hop's molestation, Bert Jones had expressed his view to the group at

7

the campground that he didn't believe Hop was guilty. After that, Bert Jones felt unwelcome at the campground, shunned by the others.

Bert Jones and Steven Thayer separately walked up the access road to Hawkins Bar.  (It was on this walk that Thayer observed the confrontation between the men in the white Ranchero and Hop Summar.)  At the general store Jones showed his stab wound to some people, and one man drove them to the nearest hospital in Willow Creek.  There Jones called 911.

Jones told the responding sheriff's deputy that a man named "Hopalong" was going to be killed or injured.  As a result of Jones's report, sheriff's deputies descended upon the campground to investigate.  They did not find Hop's body.  (It was not discovered until October 6, by a local resident searching for wood.) But they did uncover some incriminating pieces of evidence.

*The Investigation*

When various officers (from Humboldt and Trinity County Sheriff's Departments, the California Highway Patrol, the Department of Forestry) arrived in Hawkins Bar, the white Ranchero was parked at the top of the access road with Bird MacCarlie in the front seat.

Sergeant Kartchner, the investigating officer, first checked several places he thought he might find Hop-Sue Hamby's trailer, Bird MacCarlie's trailer, and adjoining trailers.  In the trailer occupied by Ron Ammon and Ila Olson he found Redbeard Bob Bond and defendant Fenenbock, both drunk and disheveled.  Neither had seen Hop, they said.

Sergeant Kartchner headed for the campground.  On the way, he passed the white Ranchero with Bird MacCarlie at the wheel. Sergeant Kartchner stopped to talk to MacCarlie, and within a few minutes Randy H. popped up from beneath some blankets in the back of the truck; he then sank back down again.

A trail of blood drops led from underneath the Ranchero to a larger area of blood near some beads and scalp hair.  The officers asked MacCarlie to move the Ranchero so they could get a better look, but MacCarlie told them the truck was inoperable.  The officers pushed the vehicle forward.

Bird MacCarlie had a fresh cut on his index finger.  He wore a knife sheath, but the sheath was empty.  He was barefoot and wearing a clean Hard Rock Cafe T-shirt. MacCarlie was

1    eventually placed under arrest that night.

2    Down in the campground, Sergeant Kartchner interviewed
     several people.  Tex Lockley had a bloody knife and was
3    arrested.  Deputy Rist was assigned to stand by defendant
     Sue Hamby while she was waiting to be questioned.  The
4    deputy observed and seized a large buck knife in her back
     pocket.  Human blood was later detected on the knife.
5
     Mike Sutton told Sergeant Kartchner that night that he knew
6    nothing.  Later, however, he provided much of the
     incriminating evidence against defendants.
7
     *The Aftermath*
8
     Mike Sutton testified that on the night of October 2, Tex
9    Lockley returned to the campsite and said to Barbara
     Adcock, "It's done."  Defendant Cherri Frazier replied,
10   "Good."  Barbara Adcock told them both to "shut up."

11   Defendant Fenenbock lived in a trailer on the property of Sid
     Smith.  Redbeard Bob Bond and defendant Fenenbock were
12   dropped off at the Smith residence about 8 p.m. that night by
     Bird MacCarlie driving the white Ranchero.[FN]  Fenenbock
13   told Patsy Brown, Sid Smith's wife, "You don't have to worry
     about that child molester anymore.  We took care of him."
14   Patsy Brown later told Sergeant Kartchner that two women
     were in the back seat of the Ranchero, and she heard Cherri
15   Frazier's voice.

16            FN. This evidence-from Patsy Brown and from
              a neighbor of Sid Smith's-corroborates the
17            testimony of Randy H., who said that after the
              killing Bird drove to Sid Smith's and dropped off
18            Redbeard Bob and defendant Fenenbock.

19   The next day, October 3, defendant Fenenbock, Redbeard
     Bob Bond, and Barbara Adcock arrived at the home of Sue
20   Mendes in Willow Creek.  Fenenbock gloated that the "cops
     didn't even check [his] hands for blood."  When Sue Mendes
21   commented that she hoped Hop's body was not in locations
     where she hunted for mushrooms with her children, both
22   Fenenbock and Redbeard Bob told her not to worry about it.

23   *The Back Pack*

24   On the morning of October 3, Mike Sutton saw defendant
     Sue Hamby rummaging through the back of Tex Lockley's
25   red truck. She pulled out a backpack, which she said was
     Hop's.

26

Scarecrow Roanhouse also saw Hamby with the backpack. He saw her open it, search through it, then wipe the outside with a wet cloth.  She asked Scarecrow to burn it, but he refused.  According to Scarecrow, Mike Sutton suggested cutting it into pieces.

That afternoon, Hamby approached Deputy Litts in the campground and told him she wanted to turn over Hop's backpack. He picked it up from her house that evening. Hamby told him Hop had given it to her the day before.  The backpack was stained with Hop's blood.

*The Physical Evidence*

Although the white Ranchero was observed near a pool of blood on the night of October 2, Sergeant Kartchner did not notice anything of evidentiary value, and the car was not seized until late October. By then there were no traces of blood.

Tex Lockley's red truck, however, was seized after a sheriff's deputy noticed blood on it.  Blood splatters were found inside the truck, as if numerous blows had been struck there.  And blood stains were found several places on the exterior of the truck.  There was also blood on the driver's seat, smeared as if someone sat in it. And there were blood stains on the seat of Tex Lockley's pants. Rope was also found in the back of the truck.

A shovel found in the red truck had a mixture of blood matching Hop's blood and Bird MacCarlie's blood.  Bird MacCarlie had a fresh cut on his finger when he was arrested on October 2.  The prosecutor theorized that Bird cut himself burying Hop.

Defendant Fenenbock was arrested the following day, on October 3, on an outstanding warrant.  He had a bloody knife which was seized by police.  The blood could not be proven to be human.

A $20 bill and a $100 bill in the police inventory were found to be stained with Hop's blood.  Bird MacCarlie had $525.59 when he was arrested.  Defendant Fenenbock had $32.96. (The booking procedures used by the Trinity County Sheriff's Department do not isolate particular bills taken from prisoners.)

*Fenenbock's Defense*

Defendant Fenenbock testified that he first heard of the molestation allegations on the morning of October 2.  He

heard Barbara Adcock tell the group about the molestation, and when someone asked, "What are you going to do about Hop?"  Barbara Adcock said the police were looking for him and if anything happened to him, she and Bird would be the first ones the police would come to.

Fenenbock admitted confronting Hop that afternoon with Redbeard Bob Bond at the top of the access road.  He claimed that he tried to calm Redbeard Bob down and restrained him from hitting Hop. Fenenbock admitted punching Hop once, but only after Hop swung his backpack at him.

Fenenbock saw the white Ranchero drive up with Bird MacCarlie driving and Leafe Dodds and Harry Darr in the back seat.  There was also a yellow Toyota truck with someone in the driver's seat.[FN] Fenenbock, however, left the scene and went back down to the campground. Redbeard Bob Bond and Harry Darr came with him. Later, Bird MacCarlie returned to the campground and gave defendant Fenenbock and Redbeard Bob Bond a ride back to Fenenbock's trailer on Sid Smith's property.

> FN. Tattoo Ernie Knapp had a yellow pickup truck.

Trena Knapp, wife of Tattoo Ernie Knapp, testified that after the confrontation with Bert Jones she saw Bird MacCarlie drive the white Ranchero out of the campground with Redbeard Bob Bond and Leafe Dodds, but it returned five minutes later.  After dinner, about 8:30, Bird MacCarlie, Redbeard Bob Bond, and defendant Fenenbock left in the Ranchero with Randy H. asleep in the back.

*Frazier's Defense*

Defendant Frazier testified that she gave a ride to Mike Sutton on September 30, but she did not discuss the molestation accusations with Sutton or threaten Hop.  In fact, she did not know about the molestation at that time.  She gave Mike Sutton and Bert Jones a ride again on October 1, but there was no conversation about Hop.

Frazier was at the picnic table when Barbara Adcock complained that the authorities weren't going to do anything. But Frazier denied discussing how to kill Hop or asking Mike Sutton or Bert Jones if they wanted to be involved.

When Hop came into the campground in Tex Lockley's truck, Frazier took Rachelle H. and the two boys into the bathroom at Barbara Adcock's request.  She heard Redbeard Bob

11

Bond yell that Hop was at the top of the hill.  And she saw Bird MacCarlie, Redbeard Bob Bond, Leafe Dodds and Randy H. leave the campground in the Ranchero.

Frazier and Michelle Dodds then drove into Willow Creek to buy some tequila.  They passed Bert Jones and Steven Thayer hitchhiking on the highway.  Frazier testified that she drank too much tequila and passed out for about three hours.  When she awoke, she saw Bird MacCarlie, Redbeard Bob Bond, defendant Fenenbock and others in the campground.  Bird MacCarlie was wearing no shirt and his hair was wet.  He said he had stabbed Hop.

The next day Frazier asked Barbara Adcock what happened to Hop, and Barbara Adcock traced her finger across her throat. Frazier also heard Barbara Adcock and Sue Hamby discussing where the body was located, whether the police would ever find the body.

A few days later, Frazier was riding in the Ranchero with Barbara Adcock when Adcock asked Frazier to look around and see if there was any blood on the door or dashboard. Frazier didn't see any.

*Hamby's Defense*

Defendant Sue Hamby testified that she and Hop were friends.  He showed up at her house on September 29 and joined her and Scarecrow Roanhouse for a barbecue.  Hop spent the night on her couch.  The next day she dropped him off near the trailer park.

On October I, Barbara Adcock arrived at Hamby's trailer and told Hamby that Hop had molested Rachelle.  Barbara Adcock said she had told the police Hop was staying at Hamby's house and the police were on their way.  Hamby replied that Adcock was misinformed; that she (Hamby) did not know where Hop was. Adcock asked Hamby not to tell Hop that the police were coming for him.

That night Hamby went into Simon Legree's bar to use the phone. Hop was there, passed out at the bar.  Hop's face had been beaten. Hop told Hamby he had been called a rapist, and he asked Hamby if he could stay at her house for the night.  Hop got into the back of her truck, and she drove him to her house.  He slept on her couch. When Hamby left the next morning, Hop was still asleep on her couch. She never saw him again.

Hamby went to the campground to see why Hop had been beaten. When she got there, Barbara Adcock complained

12

that the police weren't going to do anything about the molestation of her daughter.

Hamby disputed the testimony of Mike Sutton.  Hamby denied asking Barbara Adcock or others whether she should keep Hop at her place.  When Barbara Adcock asked Hamby where Hop was, Hamby lied and said she did not know.  Later, Michelle Dodds asked Hamby if she was going to keep Hop at her place until Hop could be dealt with. Hamby replied that she was not keeping Hop at her house; that she did not know where Hop was.  Hamby denied apologizing to Mike Sutton for soliciting his help.

Hamby left the campground, and when she returned the confrontation with Bert Jones had just concluded.  Barbara Adcock was yelling and screaming, and she yelled at Hamby that she was "going to kick [her] ass."  Hamby did not see Hop come down into the campground.  She was in the bathroom, but she heard Barbara Adcock shout "Get him out of here."  When Hamby emerged from the bathroom, Cherri Frazier was entering with the [] children.

Hamby heard but did not see the Ranchero leave the campground. Hamby herself left the campground with Scarecrow and Trena Knapp to get a grill for the barbecue.

On October 3, the day after Hop disappeared, Hamby was in the campground talking with Barbara Adcock, and Hamby told Adcock, "They are not going to find anybody ... with a helicopter." What she meant was that a helicopter would be useless for finding Hop in the forest.

Hamby denied taking Hop's backpack from Tex Lockley's truck. She denied wiping blood or fingerprints off Hop's backpack.  What Scarecrow Roanhouse saw her cleaning was dirt (Scarecrow's footprints) from her own purse. Hamby did turn in Hop's backpack to Deputy Litts-the backpack Hop had left in her trailer.

/////

Opinion at 2-14.

      B.      <u>State Court Proceedings</u>

Nine persons, Robert Bond, Bernard MacCarlie, Leafe Dodds, Robert Fenenbock, Ernest Knapp, Anthony Lockley, Barbara Adcock, Cherri Frazier, and Sue Hamby were charged in December of 1991 and October of 1992 with various crimes relating primarily to the death of Gary Hop Summar.  There were extensive and

13

voluminous pretrial proceedings.  Ultimately all charges as to Ernest Knapp were dismissed.  The remaining eight persons were tried in three separate cases in two different counties.  With the exception of Dodds, all were convicted of various offenses, and the post-trial proceedings were eventually concluded.

C.   Federal Court Proceedings

Fenenbock's federal habeas corpus proceeding has been pending for more than a decade, consumed by the vast state record, the five related federal cases pending in this Court, and overwhelming procedural issues.  These included numerous defense motions, a stay for state exhaustion proceedings, two amended petitions, a motion to dismiss and a response.  On September 9, 2005, Magistrate Judge Dale A. Drozd held a hearing, resulting in a lengthy report and recommendation resolving complex procedural matters, particularly the respondent's motion to dismiss, involving circuitous issues concerning the timeliness of multiple claims.  Judge Drozd's comprehensive report of September 11, 2006, was adopted by Senior United States District Judge Lawrence K. Karlton on July 6, 2007.  The Court having resolved the labyrinthine procedural questions, Fenenbock was given time to file a second amended petition raising the seven claims remaining in the case.

On May 15, 2009, Fenenbock filed a second amended petition. Respondent filed an answer on July 20, 2009, and Fenenbock's traverse was filed on January 4, 2010.  This matter is therefore now ready for resolution.

IV.   APPLICABLE STANDARD OF HABEAS CORPUS REVIEW

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established federal law,
> as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the
> evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Although "AEDPA does not require a federal habeas court to adopt any one methodology," Lockyer v. Andrade, 538 U.S 63, 71 (2003), there are certain principles which guide its application.

First, the "contrary to" and "unreasonable application" clauses are different.  As the Supreme Court has explained:

> A federal habeas court may issue the writ under the
> "contrary to" clause if the state court applies a rule different
> from the governing law set forth in our cases, or if it decides
> a case differently than we have done on a set of materially
> indistinguishable facts.  The court may grant relief under the
> "unreasonable application" clause if the state court correctly
> identifies the governing legal principle from our decisions but
> unreasonably applies it to the facts of the particular case.
> The focus of the latter inquiry is on whether the state court's
> application of clearly established federal law is objectively
> unreasonable, and we stressed in Williams [v. Taylor, 529
> U.S. 362 (2000)] that an unreasonable application is different
> from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002).  It is the habeas petitioner's burden to show the state court's decision was either contrary to or an unreasonable application of federal law.  Woodford v. Visciotti, 537 U.S. 19, 123 S. Ct. 357, 360 (2002).  It is appropriate to look to lower court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 2000).

Second, the court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). So long as the state court adjudicated petitioner's claims on the merits, its decision is

15

1   entitled to deference, no matter how brief.  Lockyer, 538 U.S. at 76; Downs v. Hoyt, 232

2   F.3d 1031, 1035 (9th Cir. 2000).

3          Third, in determining whether a state court decision is entitled to

4   deference, it is not necessary for the state court to cite or even be aware of the

5   controlling federal authorities "so long as neither the reasoning nor the result of the

6   state-court decision contradicts them."  Early v. Packer,  537  U.S. 3, 8 (2003).

7   Moreover, a state court opinion need not contain "a formulary statement" of federal law,

8   so long as the fair import of its conclusion is consonant with federal law.  Id.

9   V.     DISCUSSION OF PETITIONER'S CLAIMS

10         A.     Actual Innocence

11                1)     Description of Claim

12         Fenenbock argues that he is innocent of the murder of Hop Summar.  In

13   support of his argument he relies primarily on the testimony of Bernard MacCarlie, from

14   MacCarlie's trial, a post-acquittal declaration from Leafe Dodds, and the testimony of

15   Department of Justice Criminalist Carmel Suther, also from MacCarlie's trial.

16         Fenenbock argues that MacCarlie's testimony exculpated Fenenbock and

17   his other co-defendants, and directly refuted Randy Hogrefe's testimony, which

18   Fenenbock claims "was the product of such highly suggestive and unreliable

19   questioning techniques, that it cannot be considered credible evidence of [Fenenbock's]

20   guilt."  With respect to Leafe Dodd's declaration, Fenenbock argues that it "directly

21   undermines a crucial piece of the prosecution's case," specifically Randy's testimony

22   that he was in the Ranchero when MacCarlie left the campground.  Finally, Fenenbock

23   raises Carmel Suther's testimony from MacCarlie's trial where Suther acknowledged

24   that the blood found on Fenenbock's knife was probably animal blood and not human

25   blood, while at Fenenbock's trial she testified that she could not say if the blood on the

26   knife was human.

1    Respondent argues that Fenenbock has failed to state a cognizable claim

2  for relief and has failed to make a "truly persuasive" showing of innocence.

3    2)    Applicable Law

4    Fenenbock and respondent acknowledge that Fenenbock raised this claim

5  in his state petition for habeas corpus and that this claim was summarily denied.  Where

6  the state court reaches a decision on the merits but provides no reasoning to support its

7  conclusion, a federal habeas court independently reviews the record to determine

8  whether habeas corpus relief is available under section 2254(d).  Himes v. Thompson,

9  336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

10    In Herrera v. Collins, 506 U.S. 390 (1993), a majority of the Supreme Court

11  assumed, without deciding, that a freestanding claim of actual innocence is cognizable

12  under federal law.  In this regard, the court observed that "in a capital case a truly

13  persuasive demonstration of 'actual innocence' made after trial would render the

14  execution of a defendant unconstitutional, and warrant federal habeas relief if there were

15  no state avenue open to process such a claim."  Id. at 417.  A different majority of the

16  Supreme Court explicitly held that a freestanding claim of actual innocence is cognizable

17  in a federal habeas proceeding.  Compare 506 U.S. at 417 with 506 U.S. at 419 and

18  430-37.  See also Jackson v. Calderon, 211 F.3d 1148, 1165 (9th Cir.2000) (noting that

19  a majority of the Justices in Herrera would have supported a free-standing claim of

20  actual innocence).  Although the Supreme Court did not specify the standard applicable

21  to this type of "innocence" claim, it noted that the threshold would be "extraordinarily

22  high" and that the showing would have to be "truly persuasive."  Herrera, 506 U.S. at

23  417.  More recently, the United States Supreme Court declined to resolve whether

24  federal courts may entertain independent claims of actual innocence but concluded that

25  the petitioner's showing of innocence in the case before it fell short of the threshold

26  suggested by the Court in Herrera.  House v. Bell, 547 U.S. 518, 554-55 (2006).  Finally,

1    the Supreme Court has recently once again assumed, without deciding, that a federal

2    constitutional right to be released upon proof of "actual innocence" exists.  District

3    Attorney's Office for Third Judicial Dist. v. Osborne, --- U.S. ----, 129 S.Ct. 2308 (2009).

4    In doing so, the Supreme Court noted that it is an "open question" whether a

5    freestanding claim of actual innocence exists and that the court has "struggled with it

6    over the years, in some cases assuming, arguendo, that it exists while also noting the

7    difficult questions such a right would pose and the high standard any claimant would

8    have to meet."  Osborne, 129 S.Ct. at 2321.

9           The Ninth Circuit Court of Appeals has likewise assumed that freestanding

10   innocence claims are cognizable in both capital and non-capital cases and has also

11   articulated a minimum standard of proof in order to prevail on such a claim.  Carriger v.

12   Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc).  Under that standard "[a] habeas

13   petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt

14   about his guilt, and must affirmatively prove that he is probably innocent."  Carriger, 132

15   F.3d at 476-77.  See also Jackson, 211 F.3d at 1165.  The petitioner's burden in such a

16   case is "extraordinarily high" and requires a showing that is "truly persuasive."  Carriger,

17   132 F.3d at 476 (quoting Herrera, 506 U.S. at 417).

18          In support of his argument, Fenenbock has offered the testimony of

19   Bernard MacCarlie, from MacCarlie's trial, a post-acquittal declaration from Leafe Dodds,

20   and the testimony of Department of Justice Criminalist Carmel Suther, also from

21   MacCarlie's trial.  In considering a claim of actual innocence, however, the analysis is not

22   limited to the allegedly new evidence proffered by petitioner.  See House v. Bell, 547

23   U.S. 518, 537-38 (2006) (applying less onerous Schlup gateway standard); Schlup v.

24   Delo, 513 U.S. 298, 327 (1995); Carriger, 132 F.3d at 478.  Rather, the reviewing court

25   "must consider all the evidence, old and new, incriminating and exculpatory, without

26   regard to whether it necessarily would be admitted under rules of admissibility that would

18

1  govern at trial." <u>House</u>, 547 U.S. at 538 (citations and internal quotations omitted).

2          3) <u>Discussion</u>

3          To say that the amount of evidence in this matter is vast would be an

4  understatement.  The murder of Hop Summar resulted in charges against nine

5  defendants and three separate trials, with each trial involving numerous witnesses and

6  generating thousands of pages of transcripts.  In an effort to determine whether there is

7  new proof that an innocent man was convicted in this case, the court has expended a

8  great many hours studying the available records. That effort has persuaded the

9  undersigned that Fenenbock has not established that he is actually innocent of the

10  offense for which he is incarcerated.

11          The evidence has been reviewed, detailed, and scrutinized many times,

12  both over the years and in this federal proceeding, and need not be stated yet again. The

13  question before this court is whether in consideration of the entire extended record, the

14  petitioner has managed to provide new evidence that he is actually innocent.  In that

15  effort, he points to three specific items.

16          a.) <u>MacCarlie's Testimony at His Own Trial</u>

17          Bernard MacCarlie's testimony at his own trial resembles a dream

18  sequence, in which he sat in a tree and watched a man beat and stab Hop Summar to

19  death, thereafter noticing that the assailant was himself.  This testimony supported

20  MacCarlie's defense that he suffered from mental illness, including depression, post

21  traumatic stress disorder, and severe alcoholism.

22          Asked on cross examination if his co-defendants, Robert Bond and Leafe

23  Dodds were at the murder scene, MacCarlie responded that he did not see them.  He did

24  not testify that Bond and Dodds were not at the scene, only that he did not see them.

25  This testimony certainly did not exculpate petitioner Fenenbock.

26  /////

19

1        The argument made by the petitioner is essentially that since at

2  MacCarlie's own trial he did not testify that he saw Fenenbock or anyone other than

3  himself at the murder scene, there was in fact no one else there.

4        Fenenbock also argues that MacCarlie's testimony at his own trial "directly

5  refuted" several points testified to by Randy Hogrefe at Fenenbock's trial.  Randy

6  indicated that 1) Randy was hiding in the back of the Ranchero when it left the

7  campground; 2) Fenenbock, Bond, and Dodds got in the vehicle at some point, and

8  Summar was forced into the Ranchero, which was then driven to the log landing; and 3)

9  the Ranchero stopped at Sid Smith's home to drop off Fenenbock after the murder.

10       According to MacCarlie's testimony, Randy was in the Ranchero several

11 times on October 2 and did go in that vehicle to the store early in the day, when Randy

12 may have purchased candy, and he was also in the back of the Ranchero after the

13 murder, when MacCarlie took Bond and Fenenbock from the campground to Sid Smith's

14 place, stopping at the BP station, which was closed, and where no purchase was made.

15       Fenenbock argues that these portions of MacCarlie's testimony

16 demonstrate that while it is true that Randy was in the Ranchero with MacCarlie several

17 times that day, his description of stopping at the BP station after the murder was a

18 confusion on Randy's part of the trip to Sid Smith's with the earlier trip to the store,

19 rather than as he testified, a description of the return trip from the murder scene.

20       Fenenbock argues that MacCarlie's testimony at his own trial is newly

21 discovered evidence that Fenenbock was not at the murder scene as testified to by

22 Randy Hogrefe, and that he is actually innocent of the crime.  He further argues that he

23 had no way of knowing that MacCarlie would testify as he did, and that having pleaded

24 not guilty to all charges against himself, MacCarlie was not available for interview by

25 Fenenbock's trial counsel.

26 /////

1    MacCarlie's defense of mental illness and alcoholic blackout was

2 apparently credited by MacCarlie's own jury at least with regard to his inability to form

3 the intent requisite for first or second degree murder, as the jury was hung on the murder

4 charge.  Fenenbock nevertheless argues that MacCarlie's testimony about sitting in a

5 tree seeing himself murder Hop but not seeing anyone else at the scene would have

6 been credible to Fenenbock's own jury, along with MacCarlie's testimony about Randy's

7 trips in the Ranchero.  In short, MacCarlie's jury thought him mentally ill, but

8 Fenenbock's jury would have believed his testimony.

9                          b.) Declaration of Leafe Dodds

10    Leafe Dodds was tried in the second of the three state trials, along with

11 Robert Bond and Bernard MacCarlie.  He did not testify at the trial and was acquitted of

12 all charges.  Thereafter, when he was no longer subject to prosecution, he provided a

13 declaration, which in relevant part, asserts that he, Dodds, was in the back of the

14 Ranchero when it was driven to the top of the hill, and that Randy Hogrefe was not with

15 him.  Hop Summar was in the red truck at the top of the hill.  MacCarlie got out of the

16 Ranchero and punched Hop several times.  Fenenbock approached Dodds with beer,

17 saying "F---- this, let's get out of here," and walked toward the campground.  Dodds

18 drove the Ranchero to the bottom of the hill and saw Fenenbock heading toward a

19 campsite.

20    Fenenbock argues that this declaration undermines Randy Hogrefe's

21 testimony that Randy was in the Ranchero when MacCarlie left the campground after

22 Bert Jones was stabbed, and that Fenenbock, Bond, and Dodds were also in the

23 Ranchero at that time.  The Ranchero proceeded to the top of the hill, where Summar

24 was forced to get in, and was taken to be killed.  Dodds' declaration asserts that when

25 MacCarlie drove the Ranchero to the top of the hill, he was accompanied by Dodds and

26 Harry Darr, not Fenenbock and Bond.  Moreover, Dodds later saw Fenenbock go

                                             21

1   towards a campsite, at the time the prosecution argued that Fenenbock was assisting

2   MacCarlie in Hop's murder.

3          The declaration of Leafe Dodds was not available to Fenenbock or anyone

4   else until it was given in 2002, well after the second of the three trials, in which

5   he was acquitted.  That, of course, also means that he could not again be placed in

6   penal jeopardy and could well afford and perhaps in fact be inclined to assist a former

7   friend whose trial outcome was not as felicitous as his own.

8                    c.) Testimony of Carmel Suther at MacCarlie's Trial.

9          Carmel Suther, a Department of Justice criminalist, testified at both

10  Fenenbock and MacCarlie's trials.  Her testimony concerned her examination of the

11  blood on Fenenbock's knife, found in the trunk of his car when he was arrested the day

12  after the murder.  He told the arresting officer that the knife was his, and that the blood

13  was that of a deer he had recently skinned.

14         At Fenenbock's trial, Suther testified that she tested both the knife and its

15  sheath, which both had blood on them, with more on the sheath than the knife.  She

16  testified that there were insufficient antigens to allow her to determine whether the blood

17  was human or animal.

18         A year later, at MacCarlie's trial, defense counsel for all three defendants in

19  that case, Bond, Dodds, and MacCarlie, objected to introduction of the knife and Suther's

20  testimony, arguing that there was no evidence that the knife was linked to the murder

21  and that in any event, the blood was not human.  The prosecution argued that testimony

22  about the knife was needed to support Randy Hogrefe's testimony that he saw four men

23  stab Hop Summar.  Outside the presence of the jury, Suther explained to the Court that

24  she tested the knife in numerous areas, and although she concentrated it more than she

25  normally would, she found no indication of human blood at all.  The Court sustained the

26  objection to further testimony about the knife.

1    Nevertheless, at the request of counsel for Leafe Dodds, the Court found
2  that the jury might have been confused by evidence previously admitted, and allowed
3  Suther to testify that it was her professional opinion upon examination of Fenenbock's
4  knife that the blood on the knife probably came from an animal.

5    Fenenbock argues that this also is newly discovered evidence, and is in
6  "marked contrast" to Suther's testimony at his own trial, that the tests "were
7  inconclusive."

8    Actually, however, at Fenenbock's trial, Suther testified that although she
9  could not be a hundred percent sure that the blood was not human, she would expect
10  her test to show a positive result if it were human, as there was a significant quantity of
11  blood for the test to do so.  She testified that the blood probably was not human.

12    At MacCarlie's trial, Suther was questioned by the prosecutor whether
13  based on her examination of the sheath and knife, in her professional opinion the blood
14  was from an animal, Suther agreed that it was.

15    There is simply no real difference in Suther's testimony in the two cases.
16  Her testimony in MacCarlie's case, even if newly discovered, is of no help to Fenenbock.

17    4) Conclusion

18    Upon exhaustive examination of the claim of actual innocence and the
19  record, and despite heroic effort by Fenenbock's current counsel, it is apparent that
20  Fenenbock has been unable to meet the extraordinarily high threshold for a claim of
21  actual innocence.

22    B.    Order of The Trials

23        1)    Description of Claim

24    Fenenbock argues that his rights to present a defense and compel the
25  testimony of witnesses were violated by the scheduling of his trial prior to the trial of
26  Bernard MacCarlie and Leafe Dodds.  He argues that had his jury heard testimony from

23

MacCarlie and/or Leafe Dodds, instead of only Randy Hogrefe's testimony, the outcome of his trial would have been different.

As discussed in Fenenbock's Second Amended Petition, the question of severance and the order of the trials was the subject of much pre-trial discussion.   On several occasions Fenenbock's argument prior to his trial was at odds with his argument presented here.

Fenenbock acknowledges that after the charges were initially filed the prosecutor requested that all the defendants' trials be consolidated, but that each defendant, including Fenenbock, requested separate trials.  At an August 16, 1993, hearing, "after lengthy discussions concerning the impact of certain alleged admissions made by Bond that might implicate Mr. Fenenbock . . ."  Fenenbock indicated that he was now "willing to go to trial with anyone . . .".  After the court's ruling, Fenenbock requested that he be tried first due to speedy trial concerns.  Then after the California Court of Appeal stayed the trials of MacCarlie, Bond, Dodds and Lockley, pending the resolution of a pretrial writ, the prosecution moved to continue the trials of the other defendants so that all defendants could be tried together in a single trial.  Fenenbock opposed that continuance, arguing that the prosecution was trying to "jackhammer" Fenenbock case into a continuance.  The trial court denied the continuance and Fenenbock's trial began the following week.  Fenenbock now argues that by holding his trial before the MacCarlie/Dodds trial, as he requested, the trial court violated his right to present a defense and to compel the testimony of MacCarlie and Dodds.

The constitutional right to present a defense is not absolute. Alcala v. Woodford, 334 F.3d 862, 877 (9th Cir. 2003).  "Even relevant and reliable evidence can be excluded when the state interest is strong." Perry v. Rushen, 713 F.2d 1447, 1450 (9th Cir. 1983).  A state law justification for exclusion of evidence does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate"

1  and "infringe[s] upon a weighty interest of the accused."  United States v. Scheffer, 523

2  U.S. 303, 308 (1998); see also Crane v. Kentucky, 476 U.S. 683, 689-91 (1986)

3  (discussing the tension between the discretion of state courts to exclude evidence at trial

4  and the federal constitutional right to "present a complete defense"); Greene v. Lambert,

5  288 F.3d 1081, 1090 (9th Cir. 2002).

6          Moreover, "[t]he Sixth Amendment right of an accused to compulsory

7  process to secure the attendance of a witness does not include the right to compel the

8  witness to waive his Fifth Amendment privilege." U.S. v. Trejo-Zambrano, 582 F.2d 460,

9  464 (9th Cir. 1978) (citing United States v. Gay, 567 F.2d 916 (9th Cir. 1978).  "Nor is an

10 accused entitled to compel a prosecutor to grant immunity to a potential defense witness

11 to get him to testify."  Trejo-Zambrano, 528 F.2d at 464 (citing United States v. Alessio,

12 528 F.2d 1079, 1081 (9th Cir. 1976), cert. denied, 426 U.S. 948 (1976).

13          Here, the state did not interfere with Fenenbock's right to present a

14 defense or to compel witnesses.  Fenenbock was free to present any defense he wished

15 and to seek to compel the testimony of MacCarlie and/or Dodds to support that defense,

16 but MacCarlie and Dodds were equally entitled to invoke their rights under the Fifth

17 Amendment.  The order of the trials would not have changed that fact.

18          If there had been a single trial MacCarlie might have still testified, but

19 whether that would have altered the result of Fenenbock's trial is speculation.  The state

20 sought to avoid this issue by seeking to try MacCarlie and Dodds along with Fenenbock,

21 but Fenenbock insisted his trial continue while the trial of MacCarlie and Dodds was

22 stayed.  Similarly, whether Dodds would have testified is also purely speculative as

23 Dodds did not even testify at his own trial.  Thus, the only impediment to Fenenbock

24 securing Dodds' testimony was Dodds' unwillingness to put his own defense at risk, and

25 not the order of the trials.

26 /////

1    Speculation aside, Fenenbock has failed to demonstrate any infringement

2 on his rights or prejudice suffered as a result of the trial court's decision to try the cases

3 separately.

4    C.    Errors Regarding Randy Hogrefe's Testimony

5       1)    Description of Claim

6    Fenenbock argues that errors concerning the presentation of Randy's

7 testimony and the refusal to admit impeachment evidence against Randy, violated his

8 constitutional rights.  Fenenbock raises four specific issues within this claim: 1) the

9 failure to allow defense counsel access to Randy, 2) the trial court's limitation on cross-

10 examination, 3) the preclusion of impeachment evidence, and 4) the cumulative effect of

11 these errors.

12       2)    Applicable Law and Discussion

13          a)    Access

14    Fenenbock argues that Randy's court appointed trial counsel,

15 Richard Bay, his social worker, Dolores Williams, his guardian ad litem, Donna Gordon,

16 and his therapist Sally McFall, limited defense counsel's access to Randy, while granting

17 the prosecution more access and encouraging Randy to testify against the defendants.  I

18    "Absent a fairly compelling justification, the government may not interfere

19 with defense access to witnesses."  U.S. v. Black, 767 F.2d 1334, 1337 (9th Cir. 1985).

20 Witnesses however have a right to decline a defense request for an interview.  Id. at

21 1338.  While Fenenbock details multiple inconsistencies in Randy's testimony, he does

22 not argue that the prosecution played a  role in denying the defense access to Randy.

23 Indeed, Fenenbock concedes that "the prosecutor himself was not directly involved in the

24 decision to prohibit defense access to the witness . . ." .  The decisions were made by his

25 appointed counsel, his guardian ad litem, his social worker, and his therapist.  These

26 people acted independently of the prosecutor in their respective roles to determine what

1  was in Randy's best interest.  This  is no different from a concerned parent refusing to

2  allow a child to be interviewed by defense counsel.

3         Moreover, it is not clear what additional information would have been

4  gained from greater access.  As discussed previously, Randy had made numerous

5  statements, such as "I am making this up," which were used effectively on cross-

6  examination to attack his credibility.  The jury may even have been persuaded by those

7  attacks.  Fenenbock does not suggest what further information could have been adduced

8  that would have been more beneficial than Randy's admission that he was making false

9  statements.  The limited access to Randy, if error, was harmless.

10              b)   Limitation of Cross-Examination

11         Randy Hogrefe's direct examination was completed without

12  limitation.  On cross-examination, after Randy was faced with difficult questions, his court

13  appointed counsel informed the trial judge that Randy was tiring.  A short time after

14  cross-examination resumed the following morning the trial judge called a recess and

15  inquired how much longer Fenenbock's counsel would require.  When Fenenbock's

16  counsel indicated that the remainder of cross would take some time, the court eventually

17  limited him to the rest of the day.  Fenenbock argues that the trial court violated his right

18  to confront this witness against him.

19         The right to confront witnesses, guaranteed by the Sixth and Fourteenth

20  Amendments, includes the right to cross-examine adverse witnesses to attack general

21  credibility or show  possible bias or self-interest in testifying.  Olden v. Kentucky, 488

22  U.S. 227, 231 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 678-79; Davis v. Alaska,

23  415 U.S. 308, 316 (1973).  A Confrontation Clause violation occurs where the defendant

24  is prevented from investigating "a prototypical form of bias" if "[a] reasonable jury might

25  have received a significantly different impression of [the witness'] credibility had

26  respondent's counsel been permitted to pursue his proposed line of cross-examination").

27

1  <u>Van Arsdall</u>, 475 U.S. at 680.  However, "[t]rial judges retain wide latitude insofar as the

2  Confrontation Clause is concerned" and may impose limitations on cross-examination

3  that are "reasonable" and are not "arbitrary or disproportionate to the purposes they are

4  designed to serve." <u>Id</u> . at 679; <u>Michigan v. Lucas</u>, 500 U.S. 145, 151 (1991).  "The

5  Confrontation Clause guarantees an opportunity for effective cross-examination, not

6  cross-examination that is effective in whatever way, and to whatever extent, the defense

7  might wish." <u>Van Arsdall</u>, 475 U.S. at 679 (quoting <u>Delaware v. Fensterer</u>, 474 U.S. 15,

8  20 (1985) (per curiam)).

9          During cross-examination the trial judge became concerned that Randy

10  was "in agony" and that Fenenbock's counsel could demonstrate Randy's numerous

11  prior inconsistent statements more effectively through other witnesses.  The trial judge

12  later ordered that Fenenbock's counsel complete his cross-examination of Randy by the

13  end of the day.  Indeed, counsel actually finished somewhat earlier.

14           Randy's cross-examination reveals that the jury was aware that Randy

15  acknowledged lying, fabricating statements, had given prior inconsistent statements, had

16  difficulty remembering, and that his memory as to the participants, time frame,  route

17  traveled, etc., was questionable in light of other evidence.  The testimony of other

18  witnesses also involved Randy's prior inconsistent statements.  It is unlikely that the jury

19  would have developed a significantly different impression of Randy's credibility had the

20  lengthy cross examination been allowed to proceed further.  The limitation imposed by

21  the trial judge was not unreasonable, as it appears that cross-examination was roughly

22  equal in length to direct examination, and Fenenbock's counsel completed cross-

23  examination with additional time to spare.

24          Moreover, Confrontation Clause violations are subject to a harmless-error

25  analysis.  <u>Van Arsdall</u>, 475 U.S. at 684.  A petitioner is therefore not entitled to relief

26  unless he can establish that the trial court's error "had substantial and injurious effect or

28

influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).  <u>See</u> <u>also</u> <u>Forn v. Hornung</u>, 343 F.3d 990, 999 (9th Cir. 2003) (finding that a Confrontation Clause error did not have a "substantial and injurious" effect on the verdict and that the error was therefore harmless).

During Fenenbock's cross-examination Randy admitted that he previously lied to police officers, that he was not sure if his bed time was 8 p.m. or 9 p.m., that he remembered eating dinner that night with MacCarlie and Dodds, and that he remembered Dodds being present during the trip to Sid Smith's house but could not remember where Dodd's got out of the vehicle.

Fenenbock's counsel then questioned Randy in detail about his specific version of the murder, examining the intricacies of the events, the time frame, the route the vehicle took, etc.  During this questioning, and indeed during his entire cross-examination, Randy frequently answered "I don't remember," "I don't know," or "All I remember is...".

The major themes touched on by Randy's cross-examination concerned his admissions that he had lied or fabricated statements, his prior inconsistent statements, his inability to remember, his time frame for the murder and the movements of the participants, the information he was given about the murder prior to claiming that he witnessed it, and the role of others in aiding his recollections.  It does not appear that further cross-examination could have further informed the jury's determination about Randy's credibility.

Fenenbock has failed to demonstrate that the trial judge's limitation on his cross-examination was an error or that it had a substantial and injurious effect or influence in determining the jury's verdict.

/////

/////

1

c)      Preclusion of Impeachment Evidence

2       Fenenbock's counsel sought to introduce evidence that Randy told

3   his therapist Sally McFall that he witnessed one of his foster parents "waving a gun

4   around and threatening the family," and that after McFall investigated she determined the

5   accusation was untrue.   Fenenbock argues that the trial court's refusal to allow the

6   introduction of this evidence violated his right to confront this witness against him.

7       The Sixth Amendment Confrontation Clause is applicable to the states

8   through the Due Process Clause of the Fourteenth Amendment. Hernandez v. Small,

9   282 F.3d 1132, 1137 n. 3 (9th Cir. 2002) (citation omitted).   A primary interest secured by

10  the Confrontation Clause of the Sixth Amendment is the right of an accused in a criminal

11  prosecution to cross-examine witnesses against him or her.   See Van Arsdall, 475 U.S.

12  at 678; Davis, 415 U.S. at 315.   The Confrontation Clause of the Sixth Amendment

13  "guarantees an *opportunity* for effective cross-examination, not cross-examination that is

14  effective in whatever way, and to whatever extent, the defense might wish." Fensterer,

15  474 U.S. at 20.   It does not deprive "trial judges ... [of] wide latitude ... to impose

16  reasonable limits on such cross-examination based on concerns about, among other

17  things, harassment, prejudice, confusion of the issues, the witness' safety, or

18  interrogation that is repetitive or only marginally relevant."   Van Arsdall, 475 U.S. at 679.

19  The Confrontation Clause is not violated by the exclusion of evidence when, "the jury is

20  otherwise in possession of sufficient information upon which to make a discriminating

21  appraisal of the subject matter at issue.   When the refused cross-examination relates to

22  impeachment evidence, we look to see whether the jury had sufficient information to

23  appraise the bias and motives of the witness."   Skinner v. Cardwell, 564 F.2d 1381,

24  1388-89 (9th Cir. 1977), cert. denied, 435 U.S. 1009 (1978).

25       Confrontation Clause violations are subject to harmless error analysis.

26  Holley v. Yarborough, 568 F.3d 1091, 1100 (9th Cir. 2009); Whelchel v. Washington, 232

30

1   F.3d 1197, 1205-06 (9th Cir. 2000).  "In the context of habeas petitions, the standard of

2   review is whether a given error 'had substantial and injurious effect or influence in

3   determining the jury's verdict.' " Christian v. Rhode, 41 F.3d 461, 468 (9th Cir. 1994)

4   (quoting Brecht, 507 U.S. at 637).  Factors to be considered when assessing an alleged

5   Confrontation Clause violation include the importance of the testimony, whether the

6   testimony was cumulative, the presence or absence of evidence corroborating or

7   contradicting the testimony, the extent of cross-examination permitted, and the overall

8   strength of the prosecution's case. Van Arsdall, 475 U.S. at 684.

9           After much discussion, the trial judge determined that the statement at

10  issue was "too collateral" and "too time consuming" to allow its introduction.  The court

11  was particularly concerned with the fact that McFall concluded that Randy was not telling

12  the truth about the threat by his foster parent only after she had been threatened with a

13  lawsuit for slander.  The court noted there was already substantial evidence about the

14  inconsistencies in Randy's story, including problems with the physical evidence and

15  Randy's version of events, and the court  was concerned about the amount of time it

16  would take to litigate the issue.  While Fenenbock's counsel indicated it would only take

17  half an hour to introduce the evidence, the prosecutor believed the issue could have

18  generated several days of testimony.

19          Fenenbock's cross-examination of Randy provided his jury with substantial

20  evidence that Randy had previously lied and fabricated stories of a much more serious

21  nature than that at issue here.  Further evidence of Randy's untruthfulness was admitted

22  through the testimony of other witnesses.  Fenenbock's jury had sufficient information to

23  appraise Randy's bias and motives.  Even if the refusal to allow the introduction of this

24  evidence was error, and it does not appear that it was, such error would have been

25  harmless as Fenenbock has failed to demonstrate the refusal had a substantial and

26  injurious effect or influence in determining the jury's verdict.

1              d)     Cumulative Effect of Errors

2              Fenenbock argues that even if taken individually these issues did

3   not violate his rights, the cumulative effect did violate his rights to due process, to

4   present a defense, and to confront Randy.

5              In cases where there are a number of trial errors, the court may look at "the

6   overall effect of all the errors in the context of the evidence introduced at trial against the

7   defendant." United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996) (quoting

8   United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988)).  "In other words, 'errors

9   that might not be so prejudicial as to amount to a deprivation of due process when

10  considered alone, may cumulatively produce a trial setting that is fundamentally unfair.' "

11  Alcala v. Woodford, 334 F.3d 862, 883 (9th Cir. 2003) (quoting Thomas v. Hubbard, 273

12  F.3d 1164, 1180 (9th Cir. 2001)).

13             However, "where there is no single constitutional error existing, nothing can

14  accumulate to the level of a constitutional violation." Fuller v. Roe, 182 F.3d 699, 704

15  (9th Cir. 1999), overruled on other grounds by Slack v. McDaniel, 529 U.S. 473 (2000).

16  Here there was no single error committed and therefore there was no cumulative error.

17             3)     Conclusion

18             Fenenbock has failed to establish any constitutional error or prejudice, and

19  this claim should be denied.

20  D.     Insufficient Evidence

21             1)     Description of Claim

22             Fenenbock argues there was insufficient evidence to establish that he

23  committed first degree murder because there was no evidence of premeditation or

24  deliberation.  Fenenbock argues that there was no evidence of reflection, discussion,

25  consideration or deliberation on Fenenbock's part prior to Hop's murder.  Moreover, he

26  asserts that there was no evidence demonstrating that he played any role in the planing

                                         32

1  of the murder, which he contends is buttressed by his acquittal on the conspiracy charge.

2         2)    State Court Opinion

3  The California Court of Appeal rejected this claim, stating:

4  Defendant Fenenbock argues that the evidence of deliberation and premeditation is insufficient to sustain the
5  jury's verdict of first degree murder, he argues that his conviction must be reduced to second degree murder.

6
   Fenenbock relies upon the three factors identified in People
7  v. Anderson (1968) 70 Cal.2d 15 - -planning, motive, and manner of killing- - for assessing whether a killing was
8  deliberate and premeditated.  Fenenbock contends that because the jury acquitted him of conspiracy to murder the
9  jury must have found there was no evidence that he participated in any of the pre-offense discussions of a plan to
10 kill Hop.  Further, Fenenbock argues that although Barbara Adcock and Bird MacCarlie had a motive to retaliate against
11 Hop for his suspected child abuse, this motive is too "attenuate[d]" with respect to defendant Fenenbock.  Finally,
12 Fenenbock contends that because the killing was committed in an explosion of violence there was no evidence of
13 reflection.

14 We reject Fenenbock's argument.  First, the Anderson factors, "while helpful for purposes of review, are not a sine
15 qua non to finding first degree premeditated murder, nor are they exclusive."  (People v. Perez (1992) 2 Cal.4th 1117,
16 1125).  Anderson did not refashion the elements of first degree murder or alter the substantive law of murder in any
17 way.  (People v. Thomas (1992) 2 Cal.4th 489, 517).

18 In any event, as we have already discussed in Part I, ante, the record contains strong evidence to support a finding of
19 premeditation and deliberation.  That the crime was planned was demonstrated by the testimony that when Hop asked
20 Bird MacCarlie if he was going to be taken into the woods and killed, MacCarlie replied, "Yeah, something like that."
21 Defendant Fenenbock was present during this exchange, and the evidence permits the inference that he accompanied the
22 other men with the understanding that Hop would be killed. The manner of killing, too, shows there was ample time for
23 reflection.  The men did not undertake their murderous assault upon Hop when they first confronted him.  Instead,
24 they took Hop to a remote location where his body would not be easily found.  They also tied his body and dragged it
25 further into the woods.  Hop was stabbed over 70 times by the men, defendant Fenenbock among them.  He was
26 mutilated and brutalized.  The injuries to Hop genitals confirm

what other evidence also indicated, that the killing was in retaliation for Hop's suspected molestation of Rachelle Hogrefe.  The fact that defendant Fenenbock was not a relative of the molested child in now way negates the existence of motive; if anything, it confirms that the motive was a desire for vigilante vengeance.  Taken as a whole, the evidence amply supports a finding that Fenenbock acted with premeditation and deliberation.

/////

Opinion at 29-30.

        3)      Applicable Law

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).  "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the writ, the federal habeas court must find that the decision of the state court reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.  Id. at 1275 & n.13.

The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings. Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts in the

34

testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319.  If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  A federal habeas court "makes no determination of the facts in the ordinary sense of resolving factual disputes." Sarausad v. Porter, 479 F.3d 671, 678 (9th Cir.) (internal quotation marks omitted), vacated in part, 503 F.3d 822 (9th Cir. 2007), and rev'd on other grounds, ___ U.S. ___, 129 S.Ct. 823 (2009). "Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." United States v. Cordova Barajas, 360 F.3d 1037, 1041 (9th Cir. 2004) (internal quotation marks, brackets and citation omitted).  In addition, "the assessment of the credibility of witnesses is generally beyond the scope of review." Schlup v. Delo, 513 U.S. 298, 330 (1995); accord Sarausad, 479 F.3d at 678 ("A jury's credibility determinations are entitled to near-total deference[.]") (internal quotation marks and citation omitted).

        The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict. United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991).  Thus, "[t]he question is not whether we are personally convinced beyond a reasonable doubt" but rather "whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

/////

        4)      Discussion

        Under California Law, murder that is perpetrated by "willful, deliberate, and premeditated killing" is murder in the first degree. People v. Cole, 33 Cal.4th 1158, 1224

(Cal. 2004).  "A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill.... 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance.... 'The process of premeditation and deliberation does not require any extended period of time.  "The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly." ' " Id.  (quoting People v. Koontz, 27 Cal.4th 1041, 1080 (Cal. 2002).

There are three general categories of evidence sufficient to sustain a premeditated and deliberate murder: evidence of planning, motive, and method.  Cole, 33 Cal.4th at 1224.  When all three categories of evidence are not present California courts, "require either very strong evidence of planning, or some evidence of motive in conjunction with planning or a deliberate manner of killing."  People v. Pensinger, 52 Cal.3d 1210, 1237 (Cal. 1991).  These categories however are borrowed from People v. Anderson,70 Cal.2d 15, 26-27 (Cal. 1968), and "are descriptive, not normative."  People v. Perez, 2 Cal.4th 1117, 1125 (Cal. 1992).  The categories  serve as an "aid [for] reviewing courts in assessing whether the evidence is supportive of an inference that the killing was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse."  Id.

The California Court of Appeal noted three findings in support of premeditation and deliberation: a) Fenenbock's presence during an exchange between MacCarlie and Hop where MacCarlie acknowledged that Hop was to be taken away into the woods and killed; b) the fact that Fenenbock accompanied the other men on what would be Hop's final trip into the woods with the understanding that Hop would be killed there; and c) the circumstances surrounding Hop's killing.  In addition to the findings cited by the California Court of Appeal, respondent cites additional evidence from the

1  record to support the argument that there was sufficient evidence of premeditation and

2  deliberation.

3         Thayer testified at Fenenbock's trial that after MacCarlie arrived at the top

4  of the hill location where Hop was seated in Lockley's truck, Thayer heard Hop say, "You

5  know, what are you going to do?  Kill me here?  Throw me in the bushes or something?"

6   Thayer testified that MacCarlie responded, "Yeah, something like that."  The California

7  Court of Appeal found that this exchange demonstrated that the murder was planned

8  and that the evidence permitted the inference that Fenenbock accompanied the other

9  men to the log landing with the understanding that Hop would be killed there because

10 Fenenbock was present during the exchange.

11         Thayer testified that he did not see Fenenbock when MacCarlie and Hop

12 had this exchange, but Fenenbock himself testified that he was present when MacCarlie

13 approached Hop, and heard Hop say, "What are you going to do?"  A rational juror could

14 have found that Fenenbock was present and heard MacCarlie indicate to Hop that

15 MacCarlie planned to take Hop to a remote location and murder him.

16         Moreover, Randy Hogrefe testified that he witnessed Fenenbock

17 participate in Hop's murder at the log landing.  A reasonable juror could have concluded

18 that Fenenbock, having heard MacCarlie declare his plan to murder Hop, accompanied

19 the men to the log landing as part of a premeditated plan to murder Hop at that remote

20 location.

21         With respect to the circumstances surrounding Hop's murder the California

22 Court of Appeal stated:

23         The manner of killing, too, shows there was ample time for
           reflection.  The men did not undertake their murderous
24         assault upon Hop when they first confronted him.  Instead,
           they took Hop to a remote location where his body would not
25         be easily found.  They also tied his body and dragged it
           further into the woods.  Hop was stabbed over 70 times by
26         the men, defendant Fenenbock among them.  He was

                                          37

> mutilated and brutalized.  The injuries to Hop genitals confirm what other evidence also indicated, that the killing was in retaliation for Hop's suspected molestation of Rachelle Hogrefe.

/////

Opinion at 30.

According to Randy Hogrefe,  Dodds was the first person to stab Hop, stabbing him in the eye.  That was the only time Dodds stabbed Hop.  Randy testified that after Dodds stabbed Hop in the eye "they started stabbing him."  MacCarlie was responsible for most of stabbing.  According to Randy, after the stabbing MacCarlie drug Hop over to the tree stump.  While it is apparent that Hop was mutilated and brutalized it is not clear from Randy's testimony what role Fenenbock played in that mutilation.

Respondent argues that, while not mentioned by the California Court of Appeal, there was additional evidence that "Fenenbock not only assaulted Hop at the top of the hill, but participated in his stabbing."  Respondent refers to the testimony of Patsy Brown as evidence that Fenenbock told Brown, after Fenenbock and Bond arrived at Sid Smith's house, that Brown did not need to worry about that child molester anymore, as they had taken care of him.  In the portion of transcript referenced by respondent, however, Brown expressly denied hearing Fenenbock make that statement or telling Detective Kartchner that he did.

Respondent also cites the testimony of Sue Mendes in which Mendes stated that Fenenbock told her that she would not have to worry about finding Hop's body while she was mushrooming with her children.  Mendes testified that when Fenenbock and Bond were at her home the day after Hop had been murdered "[t]hey were just laughing about . . . how the cops didn't even check their hands for blood and stuff."  This prompted Mendes to ask about the location of a body.   According to Mendes:

> Okay.  I asked him - - I go - - I was real worried about the

1    body being down at the river or something, little kids come
     across it.  And they said "No, it's not."  And I said, "I hope it's
2    not up there in the mountains of Denny, because I go up
     there every year and go tan oaking, go shrooming, because it
3    comes every year for picking."  And [Fenenbock] said, you
     know, "Don't worry about it."

4  /////

5         The statements attributed to Fenenbock by Brown and Mendes implicate

6  his involvement in Hop's murder.

7              5)    Conclusion

8         Fenenbock's presence during the exchange between MacCarlie and Hop,

9  in which MacCarlie acknowledged that Hop was to be taken to the woods and killed, and

10 Randy Hogrefe's testimony that Fenenbock accompanied the other men into the woods

11 with that understanding, supports a finding that the killing was the result of reflection and

12 weighing of considerations rather than mere unconsidered or rash impulse.  Upon this

13 evidence rational jurors could reach the conclusion that Fenenbock was guilty of first

14 degree murder.

15        The state court's rejection of this claim was neither contrary to, nor an

16 unreasonable application of, clearly established constitutional law.

17     E.    Failure to instruct

18            1)    Description of Claim

19        Fenenbock argues that the failure to give instructions on the lesser

20 included offenses of second degree murder or manslaughter, or on the defense of

21 provocation, violated his rights to a fair trial and due process.  He argues that the

22 evidence was insufficient to establish premeditated and deliberate murder and it was

23 therefore "absolutely necessary" that the jury be instructed on second-degree murder.

24            2)    State Court Opinion

25        The California Court of Appeal analyzed Fenenbock's claim at length and

26 rejected it, stating:

I. Lesser Offenses to Murder

With respect to the charge of murder, the jury was instructed only on murder in the first degree.  The trial court found no theory-of either the prosecution or the defense-to permit a jury finding of any lesser degree of homicide.  Defendant Fenenbock now argues that the trial court erred in failing to instruct sua sponte on second degree murder and manslaughter.  (In the trial proceedings, counsel for Fenenbock did not request any instructions on lesser included offenses, stating, "I think it's all or nothing....")

It is, of course, settled that the trial court must instruct on lesser included offenses, even in the absence of a request, "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged."

Defendant Fenenbock contends that the jury could have found that the evidence of premeditation and deliberation was weak so as to raise a question whether that element of first degree murder was present.  We cannot agree.  The prosecution's evidence showed that a group of men, defendant Fenenbock among them, took the victim off into the woods and killed him in retaliation for the victim's suspected molestation of Barbara Adcock's child.  When Hop asked Bird MacCarlie if he was going to be taken into the woods and killed, MacCarlie replied, in the presence of defendant Fenenbock, "Yeah, something like that."  Hence, there was evidence that defendant Fenenbock accompanied the other men with the understanding that Hop would be killed.  There was overwhelming evidence that the killing was deliberate.  The men took Hop to a remote location before commencing their murderous assault.  They also tied his body and dragged it further into the woods.  Hop was stabbed over 70 times by the men; he was mutilated and brutalized. The injuries to Hop's genitals confirm what other evidence also indicated, that the killing was an act of vengeance for Hop's suspected molestation of Rachelle H.

Fenenbock's defense was that he was not present and did not participate in the killing.  Hence, the state of the evidence was such that if the jury accepted the prosecution's proof that defendant was among the killers, the jury had ample evidence from which to find premeditation and deliberation.

Defendant Fenenbock argues, however, that the jury could have found that defendant acted in the heat of passion upon provocation (rage over Hop's alleged child molestation). Alternatively, defendant asserts that the jury might have

40

concluded that although the provocation was not adequate to reduce the crime to manslaughter, it did negate premeditation and deliberation so as to support a conviction for second degree murder.  We treat these theories in some detail.

A. Manslaughter

Of course, when the evidence suggests that the defendant acted in the heat of passion upon adequate provocation, the trial court must instruct on voluntary manslaughter.  Both provocation and heat of passion must be affirmatively demonstrated.  Here, the trial court concluded that the evidence did not justify instructions on voluntary manslaughter, and we affirm that decision.

*Heat of Passion*

As the Attorney General correctly points out, the desire for revenge does not qualify as a passion that will reduce a killing to manslaughter.  " '[T]he fundamental of the inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion-not necessarily fear and *never, of course, the passion for revenge*-to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' "

Here, there was no evidence from which the jury could have found that defendant Fenenbock's reason was so disturbed by anger or outrage that he acted impulsively.  Even if, as he claimed, defendant Fenenbock first heard the reports of child molestation on the morning of October 2, he thereupon went about his daily business and did not confront Hop Summar until later in the day when he punched Hop with his fist.  Thereafter, Fenenbock accompanied Bird MacCarlie and others to a remote spot where the men again attacked Hop, this time fatally.  The only inference to be drawn is that any passions that may have been aroused upon first hearing the reports of molestation had cooled so that the killing became an act of revenge or punishment.  In fact, the defendant's own testimony refuted any claim of heat of passion.  He denied that he was aroused by the angry feelings in the campground and claimed that he tried to calm things down.  We find no evidence to justify an instruction on the heat of passion.

*Provocation*

No specific type of provocation is required.  The provocation may be anything which arouses great fear, anger or jealousy.

41

Generally, it is a question of fact for the jury whether the circumstances were sufficient to arouse the passions of the ordinarily reasonable person.  However, where the provocation is so slight or so severe that reasonable jurors could not differ on the issue of adequacy, then the court may resolve the question.

In previous cases, the murder of a family member, a sudden and violent quarrel, and infidelity of a wife or paramour have been held to constitute legally adequate provocation for voluntary manslaughter.  On the other hand, neither simple trespass nor simple assault constitute provocation sufficient to reduce the killing to manslaughter.

In the present case, the allegedly abused child was not a relative of defendant Fenenbock, and there is no indication in the record that defendant Fenenbock had any close personal bond with the child or her parents.  The child had not been visibly injured.  We conclude there is no evidence here from which the jury could have found provocation so serious that it would produce a lethal response in a reasonable person.

B. Second Degree Murder

Nor do we believe instructions were required on second degree murder.  Defendant Fenenbock relies upon the rule that even when provocation is inadequate to negate the existence of malice so as to reduce the offense to manslaughter, the trial court must nonetheless instruct sua sponte on second degree murder if there is evidence from which the jury could find that the defendant's decision to kill was a direct and immediate response to the provocation such that the defendant acted without premeditation and deliberation.

The Wickersham court explained that the evidence of provocation must "justify a jury determination that the accused had formed the intent to kill as a *direct* response to the provocation and had acted *immediately* ...."

In the present case, for the reasons we have already expressed, there is no evidence to suggest that the reports of child molesting precluded defendant Fenenbock from acting with premeditation and deliberation.  The prosecution's evidence showed that after confronting Hop Summar on the access road and punching Hop with his fist, defendant Fenenbock drove to a remote spot in the woods, accompanied by a group of other men, for the declared purpose of killing Hop Summar.  Fenenbock and the others then stabbed and mutilated Hop in retaliation for his suspected molestation of Rachelle H. Fenenbock made no

1   affirmative claim that he acted under provocation; he
2   maintained that he did not participate in the killing.  Having
    found that Fenenbock did participate in the killing, the jury
3   could not have had reasonable doubt on whether the killing
    was premeditated.

4   Opinion at 14-18 (citations omitted).

5   /////

6           3)    Applicable Law And Discussion

7           "Normally jury instructions in State trials are matters of State law."

8   Hallowell v. Keve, 555 F.2d 103, 106 (3rd Cir. 1977) (citation omitted); see also Williams

9   v. Calderon, 52 F.3d 1465, 1480-81 (9th Cir. 1995), cert. denied, 516 U.S. 1124 (1996).

10  An instructional error "does not alone raise a ground cognizable in a federal habeas

11  proceeding." Dunckhurst v. Deeds, 859 F.2d 110, 114 (9th Cir. 1988) (citation omitted);

12  see also Van Pilon v. Reed, 799 F.2d 1332, 1342 (9th Cir. 1986) (claims that merely

13  challenge correctness of jury instructions under state law cannot reasonably be

14  construed to allege a deprivation of federal rights) (citation omitted).  A claim that a state

15  court violated a federal habeas petitioner's due process rights by omitting a jury

16  instruction requires a showing that the error so infected the entire trial that the resulting

17  conviction violated due process.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977);

18  Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005); see also Estelle, 502 U.S. at

19  72 (discussing due process standard).  In cases in which a petitioner alleges that the

20  failure to give an instruction violated due process, her burden is "especially heavy,"

21  because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a

22  misstatement of the law." Henderson, 431 U.S. at 155.  Here, Fenenbock fails to meet

23  this heavy burden.

24          First, there is no clearly established federal law that requires a state trial

25  court to give a lesser included offense instruction as would entitle Fenenbock to relief.

26  See 28 U.S.C. § 2254(d) (1); Beck v. Alabama, 447 U.S. 625, 638 & n. 7 (1980) (holding

43

1   that failure to instruct on lesser included offense in a *capital* case is constitutional error if

2   there was evidence to support the instruction but expressly reserving "whether the Due

3   Process Clause would require the giving of such instructions in a non-capital case");

4   Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam) (in non-capital case,

5   failure of state court to instruct on lesser included offense does not alone present a

6   federal constitutional question cognizable in a federal habeas corpus proceeding), cert.

7   denied, 534 U.S. 839; Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) (failure

8   of state trial court to instruct on lesser included offenses in non-capital case does not

9   present federal constitutional question), cert. denied, 541 U.S. 950 (2004).  Accordingly,

10  to the extent Fenenbock's argument is solely predicated upon the trial court's failure to

11  give a lesser included offense instruction, this claim is not cognizable on federal habeas

12  review and should be denied on that basis.

13          Second, although "the defendant's right to adequate jury instructions on his

14  or her theory of the case might, in some cases, constitute an exception to the [foregoing]

15  general rule," Solis, 219 F.3d at 929, Fenenbock's was not such a case.  See Clark v.

16  Brown, 450 F.3d 898, 904 (9th Cir. 2006) (state court's jury instructions violate due

17  process if they deny the criminal defendant "a meaningful opportunity to present a

18  complete defense"), cert. denied by, Ayers v. Clark, 549 U.S. 1027 (2006) (quoting

19  California v. Trombetta, 467 U.S. 479, 485 (1984)).

20          Fenenbock argues that there was insufficient evidence to establish

21  premeditation and deliberation sufficient for first degree murder.  As discussed supra,

22  that argument is incorrect.  Fenenbock also argues that there was sufficient evidence to

23  suggest that he participated in Hop's murder as the result of provocation.  Provocation

24  however was not one of Fenenbock's theories of the case.  Indeed, Fenenbock's sole

25  defense was that he was not involved in Hop's murder at all.  The trial court's ruling

26  therefore did not impact Fenenbock's right to adequate jury instructions on his theory of

44

1 the case.

2     Finally, Fenenbock has not made any showing as to how the alleged failure

3 to instruct had a substantial and injurious effect on the jury's verdict.  While Fenenbock

4 claims the failure to instruct on lesser included offenses resulted in an "all or nothing"

5 choice, that would not change the fact that after examining the evidence the jury found

6 sufficient evidence to convict him of first degree murder.  Any argument that the jury

7 would have only convicted Fenenbock of a lesser included offense if presented with that

8 option is purely speculative.

9     The state court's rejection of this claim was neither contrary to nor an

10 unreasonable application of clearly established constitutional law and Fenenbock is not

11 entitled to relief on this claim.

12     F.     Sandbag

13          1)     Description of Claim

14     After the defense rested, the prosecutor sought to call a number of rebuttal

15 witnesses.  One witness was Maeolla Berry who according to the prosecutor would

16 testify that she witnessed a group of people, including Fenenbock, call Hop a rapist while

17 Hop was being pursued by April May Gault who then assaulted Hop.  Another witness

18 was Sue Mendes who according to the prosecutor would testify that Fenenbock and

19 Bond were joking that "the cops didn't check the blood on his hands" and that Mendes

20 should not worry about finding Hop's body.  Defense counsel objected that these

21 witnesses should have been called during the prosecution's case in chief.  The trial judge

22 however allowed both witnesses to testify.  Fenenbock argues that this ruling violated

23 state evidentiary rules as well as his right to due process and a fair trial.  Second

24 Amended Petition at 93-94.

25 /////

26 /////

45

1

2)      State Court Opinion

2        The California Court of Appeal rejected this claim.  Opinion at 41-44.  The

3 court found no error in allowing Maeolla Berry to testify.  Id. at 41.  With respect to Sue

4 Mendes, that court found the defense objection valid, as Mendes's testimony belonged in

5 the prosecutions case-in-chief, but ultimately found no abuse of the trial court's discretion

6 to allow the belated testimony.  Id. at 42.  The court noted there was no unfair surprise to

7 Fenenbock, as he had been asked about the alleged statement to Mendes on cross

8 examination, and that the compelling evidence against Fenenbock was not Mendes's

9 testimony, but Randy's eyewitness testimony.  Id. at 41-42.

10

3)      Applicable Law And Discussion

11        Under California law, rebuttal evidence "is restricted to evidence made

12 necessary by the defendant's case in the sense that he has introduced new evidence or

13 made assertions that were not implicit in his denial of guilt."  People v. Harris, 37 Cal.4th

14 310, 336 (2005), cert. denied, 547 U.S. 1065 (2006); People v. Young, 34 Cal.4th 1149,

15 1199, cert. denied, 546 U.S. 833 (2005); People v. Carter, 48 Cal.2d 737, 753-54 (1957).

16        A federal court however is limited in conducting habeas review to deciding

17 whether a conviction violates the Constitution, laws, or treaties of the United States.  28

18 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  A state court's

19 evidentiary ruling is not cognizable on federal habeas review, unless the ruling infringes

20 upon a specific federal constitutional or statutory provision or deprives the defendant of a

21 fundamentally fair trial as guaranteed by due process.  See Pulley v. Harris, 465 U.S. 37,

22 41 (1984); Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995).  Failure to comply with

23 state rules of evidence is not a basis for granting federal habeas relief on due process

24 grounds.  See Henry v. Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999); Jammal v. Van de

25 Kamp, 926 F.2d 918, 919 (9th Cir. 1991).  The issue is whether the admission of

26 evidence was so arbitrary or prejudicial that it rendered the trial fundamentally unfair.

46

1   <u>Walters</u>, 45 F.3d at 1357.  "Only if there are *no* permissible inferences the jury may draw

2   from the evidence can its admission violate due process.  Even then, the evidence must

3   'be of such quality as necessarily prevents a fair trial.' "  <u>Jammal</u>, 926 F.2d at 920

4   (emphasis in original; citation omitted).

5              With respect to Maeolla Berry, the California Court of Appeal found no error

6   in allowing her rebuttal testimony.  Indeed, the court noted that her testimony was

7   allowable in light of Fenenbock's testimony during cross examination that he was not in

8   the town of Hawkins Bar on October 1, the day Berry allegedly saw the assault.  Opinion

9   at 42.  Fenenbock argues that Berry's testimony "went to the heart of the conspiracy

10  allegations" but does not appear to dispute that the testimony, at a minimum, also

11  refuted Fenenbock's claim that he was not in Hawkins bar on October 1.

12             Berry's testimony did not violate California law, and Fenenbock has failed

13  to demonstrate that the admission was "so arbitrary or prejudicial that it rendered the trial

14  fundamentally unfair."  Moreover, as Fenenbock acknowledges, Berry's testimony was

15  more much more central to the conspiracy charge than the murder charge.  Fenenbock

16  however was found not guilty of conspiracy, indicating that Berry's testimony was of no

17  particular import.

18             With respect to Sue Mendes, the California Court of Appeal found that

19  Fenenbock's objection to her testimony was valid, as the "prosecutor essentially

20  bootstrapped Sue Mendes's testimony into 'evidence made necessary by the

21  defendant's case' by eliciting defendant's denial about making the statements."  Opinion

22  at 43.  The court however found no abuse of discretion in allowing the testimony

23  because Fenenbock was asked about the statements to Mendes on cross-examination,

24  so there was no unfair surprise, and because the most compelling evidence connecting

25  Fenenbock to Hop's murder came from Randy.  <u>Id.</u> at 41-42.

26  /////

1    While it appears that allowing Mendes' testimony was improper under

2 California law, it cannot be said that timing rendered his trial fundamentally unfair.

3 Mendes's testimony was not particularly strong or damaging, especially in comparison to

4 Hogrefe's testimony, which was more central to Fenenbock's conviction.  Fenenbock has

5 failed to show that this admission was so arbitrary or prejudicial that it rendered his trial

6 fundamentally unfair.

7    The state court's rejection of this claim was neither contrary to nor an

8 unreasonable application of clearly established constitutional law and Fenenbock is not

9 entitled to relief on this claim.

10        G.    Cumulative Error

11            1)    Description of Claim

12    Fenenbock argues that the cumulative effect of the five claims discussed

13 supra rendered his trial fundamentally unfair, even if each error standing alone was not

14 harmful.

15            2)    Applicable Law And Discussion

16    In cases where there are a number of trial errors, the court may look at "the

17 overall effect of all the errors in the context of the evidence introduced at trial against the

18 defendant." Frederick, 78 F.3d at 1381.  "In other words, 'errors that might not be so

19 prejudicial as to amount to a deprivation of due process when considered alone, may

20 cumulatively produce a trial setting that is fundamentally unfair.' "  Alcala, 334 F.3d at

21 883.

22    However, "where there is no single constitutional error existing, nothing can

23 accumulate to the level of a constitutional violation." Fuller, 182 F.3d at 704.  Here there

24 was no single error, and therefore there was no cumulative error.

25 /////

26 /////

VI.     <u>CONCLUSION</u>

            Accordingly, IT IS RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

            These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within seven days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).  In any objections he elects to file petitioner may address whether a certificate of appealability should issue in the event he elects to file an appeal from the judgment in this case. <u>See</u> Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: May 20, 2010

_Charlene H. Sorrentino_
CHARLENE H. SORRENTINO
UNITED STATES MAGISTRATE JUDGE

49